1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS GOOLSBY, | Case No. 1:11-cv-01773-LJO-DLB PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| GENTRY, et al., | (Document 111) |
| Defendants. | |

Plaintiff Thomas Goolsby ("Plaintiff") is a California state prisoner proceeding pro se and in forma pauperis in this civil action pursuant to 42 U.S.C. § 1983.  Plaintiff filed this action on October 25, 2011, and it is now proceeding on Plaintiff's February 2, 2013, First Amended Complaint ("FAC") for retaliation in violation of the First Amendment against Defendants Gentry, Noyce, Eubanks, Tyree, Medrano, Holman, Holland and Steadman.

Defendants filed the instant motion for summary judgment on May 15, 2015.  Plaintiff filed his opposition on July 6, 2015, and Defendants filed their reply on October 27, 2015.  The motion is ready for decision pursuant to Local Rule 230(l).[1]

## I.    LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[1] Defendants provided Plaintiff with the required notice for opposing a motion for summary judgment.

to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); <u>Washington Mutual Inc. v. U.S.</u>, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); accord <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  <u>In re Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  <u>In re Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex Corp.</u>, 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  <u>Id</u>. (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a genuine issue for trial, and Plaintiff's filings must be liberally construed because he is a pro se prisoner.  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

2

## II. ALLEGATIONS IN FACT[2]

Plaintiff is currently housed at Pelican Bay State Prison.  The events at issue occurred while he was incarcerated at the California Correctional Institution ("CCI") in Tehachapi, California.

Plaintiff alleges that Defendants Gentry, Noyce, Eubanks, Tyree and Medrano initiated a validation packet against him on the orders of Defendants Holland and Steadman.  Plaintiff alleges that this was done in retaliation for filing appeals and lawsuits against them.

He explains that in June 2010, he was placed in Ad-Seg pending conclusion of an investigation into his gang activities.  On August 27, 2010, Defendant Noyce concluded the investigation and found insufficient evidence to validate Plaintiff as an associate of a prison gang.  On September 10, 2010, he was released back into the general population.

In December 2010, Plaintiff met with Defendant Holman in preparation for his inmate classification hearing.  Defendant Holman told Plaintiff that Defendant Holland "told me to tell you to drop your lawsuits on her or . . . else your [sic] going back to the hole permanently validated." FAC, at 6 (ECF No. 15).  Plaintiff did not reply and did not drop his lawsuits.

On February 11, 2011, Plaintiff was placed in Ad-Seg pending validation as an associate of the Nazi Low Rider prison ("NLR") gang.  Defendant Eubanks gave him his validation packet and Defendant Tyree had signed his lock-up order.  Plaintiff alleges that upon reviewing his packet, the documents in his validation packet were the same as those used by Defendant Noyce to find insufficient evidence six months prior.

On April 11, 2011, Plaintiff alleges that Defendant Eubanks admitted that the only reason that Plaintiff was validated was because of his lawsuits and appeals.  He alleges that his placement in segregated housing has made it more difficult to conduct legal work, prosecute litigation and use the law library.

///

///

///

---

[2] On November 13, 2014, the Court granted summary judgment in favor of Defendants on Plaintiff's due process claim relating to the sufficiency of the evidence used to validate him.  Only the retaliation claim remains, and the Court will only summarize evidence relating to this claim.

III.   **UNDISPUTED MATERIAL FACTS**

During all relevant times, Plaintiff was incarcerated at CCI.[3]

A.   Evidence Relating to Plaintiff's Validation

The term "prison gangs" refers to those gangs that originated in prisons. Eubanks Decl. ¶ 2 (ECF No. 111-6). The California Department of Corrections and Rehabilitation ("CDCR") has determined that gangs and their activities are a threat to the safety and security of prisons and jails, and are a danger to public order and safety. Eubanks Decl. ¶ 2. CDCR's gang management strategy is to identify gang-affiliated inmates, track them, monitor their conduct and take interdiction action. Eubanks Decl. ¶ 2. CDCR's validation process is used to identify gang affiliated inmates.[4] Eubanks Decl. ¶ 2.

The NLR are a designated prison gang under section 52070.17.2 of the Department of Operations Manual. The NLR is a White-supremacist prison gang primarily based in southern California, and was originally allied with the Aryan Brotherhood ("AB").[5] Eubanks Decl. ¶ 3.

Defendant Eubanks has been an Assistant Institutional Gang Investigator ("IGI") at CCI since 2002. The Investigative Services Unit requires him to track and monitor White gangs, including the AB and NLR, at CCI. Eubanks Decl. ¶ 1. It was his responsibility to collect and document information regarding gang activities and transmit the information to Defendants Gentry or Noyce, the Institutional Gang Investigators. Eubanks Decl. ¶ 5.

On March 19, 2009, Defendant Eubanks was conducting an investigation into prison-gang matters unrelated to Plaintiff. During this investigation, Defendant Eubanks uncovered a handwritten note which was in the possession of a validated NLR inmate. The note identified Plaintiff as being involved in the assault of NLR member "Whitey" David Westley on the orders of

---

[3]  Defendants include facts relating to Plaintiff's prison disciplinary record from 2006 through 2011. Defendants cite this evidence in arguing that adverse action would have been taken against Plaintiff even if any bad motive existed. Only evidence relating to Plaintiff's gang involvement is relevant to this inquiry, and the Court will not consider facts related to Plaintiff's disciplinary record to the extent that it is not related to his validation.

[4]  Plaintiff attempts to dispute this fact by arguing that the validation process has been misused to get rid of unwanted inmates. This is argument and speculation, however, and does not render the fact disputed.

[5]  Plaintiff states that he denies these and other facts because he "lacks information to admit or deny." Pl.'s Opp'n, at 58 (ECF No. 123). To dispute a fact, Plaintiff must "designate *specific facts* demonstrating the existence of genuine issues for trial". In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323) (emphasis added). Citing a "lack of evidence" does not create a factual dispute. This analysis is applicable to each fact for which Plaintiff asserts a "lack of information."

4

1   NLR member "Hoss" Thomas Williams.[6]  The note also indicated that Plaintiff was passing notes

2   containing gang business to and from known NLR members.  Eubanks Decl. ¶ 4.

3          On April 6, 2009, Defendant Eubanks authored a Confidential Memo addressed to Defendant

4   Gentry.  The memo summarized the findings of the March 19, 2009, investigation and contained

5   copies of the note he discovered.  Eubanks Decl. ¶ 5.  Because some of the information gathered on

6   March 9, 2009, concerned Plaintiff, a copy of Defendant Eubanks' April 6, 2009, memo was placed

7   in Plaintiff's file.  Eubanks Decl. ¶ 6.  The information referenced in the April 6, 2009, memo was

8   used to validate Plaintiff as an NLR associate.  Eubanks Decl. ¶ 6.

9          On May 15, 2009, Defendant Tyree conducted a search of Plaintiff's personal property as

10  part of an investigation concerning Plaintiff's gang status.  Defendant Tyree found an address book

11  in Plaintiff's possession.  Tyree Decl. ¶ 2.  Defendant Tyree copied Plaintiff's address book, which

12  was investigated and analyzed at a later time.  Tyree Decl. ¶ 2.  The address book was not analyzed

13  immediately because of "economy of effort."  Plaintiff's address book listed dozens of inmates.

14  Each inmate must be identified and then their confidential file must be obtained and studied to

15  determine if the inmate is affiliated with a gang.  Analysis of the address book was a labor-intensive

16  effort that was done only after it was certain that other evidence existed sufficient to validate

17  Plaintiff.   Tyree Decl. ¶ 2.  Plaintiff admits that he had NLR members Pandolfi and Baumgaertel's

18  names, CDCR numbers and addresses in this address book.

19         On May 15, 2009, Correctional Officer Robinson searched the personal property of "Dago"

20  Samuel Bailey at CCI.  Officer Robinson found a note purportedly authored by Plaintiff.  He turned

21  the note over to Defendant Tyree for investigation.  Tyree Decl. ¶ 4.

22         In the note, Plaintiff identified himself and questions Bailey about the location of his CDCR-

23  128 G Classification Chrono.  He informed Bailey that he is "quite close" to Inmates Gehrke and

24  Allen (both validated NLR members).  Plaintiff also questioned Bailey about his status and why he

25  didn't want to be included on the active White Inmate "Roll Call."  The note was signed "W/R [with

26  respect], Klumzy."  Tyree Decl. ¶ 4.  Plaintiff goes by the nickname "Klumzy."  Tyree Decl. ¶ 5.

27  ///

28
_____
[6]  Plaintiff denies that he was involved in the assault on Inmate Westley.  Pl.'s Decl. ¶ 6.  However, given that the
validity of Plaintiff's validation is no longer an issue, Plaintiff's involvement is not relevant.

On July 26, 2009, Defendant Tyree authored a Confidential Memo addressed to IGI Lt. Defendant Gentry.  The memo summarized the findings of the May 15, 2009, investigation and contained photocopies of the note.  Tyree Decl. ¶ 6.  The information referenced in the memo was used as evidence to validate Plaintiff as an NLR associate.  Tyree Decl. ¶ 7.

On December 18, 2009, Security Squad Officer R. Frye searched the personal property of two validated NLR members (Inmates Gehrke and Allen) and discovered two rosters of White inmates housed in the SHU at CCI-IVB who were in good standing with the NLR.  The lists contained the inmates' names, monikers, hometowns and CDCR numbers.  Eubanks Decl. ¶ 7.

On January 26, 2010, in accordance with his duties, Defendant Eubanks authored a Confidential Memorandum to Defendant Gentry.  The memo summarized the findings of the investigation into the rosters found on December 18, 2009, and contained photocopies of the rosters.  Eubanks Decl. ¶ 9.  The information referenced in the January 26, 2010, memo was used as evidence to validate Plaintiff as an NLR associate.  Eubanks Decl. ¶ 11.  Plaintiff admits that Inmates Gehrke and Allen had his name, prison number, hometown, and nickname "Klumzy" on a list in their cell.[7]

On May 10, 2010, Assistant IGI Hopkins conducted a debriefing interview with an inmate wishing to disassociate from the NLR gang.  During the debriefing, the inmate identified Plaintiff as being a courier of notes on behalf of the NLR and being involved in the assault of validated NLR member "Whitey" David Westley.  The inmate told Hopkins that the assault on Westley was at the direction of validated NLR member "Hoss" Thomas Williams.  Hopkins Decl. ¶ 3.  The information provided by the inmate was considered reliable and met the criteria of Title 15, section 3321(c)(1)(2)(3).  Hopkins Decl. ¶ 5.

On May 25, 2010, Hopkins authored a Confidential Memo summarizing the debriefing of the inmate on May 6, 2010.  Hopkins Decl. ¶ 4.  Officer Hopkins does not work at CCI, and he conducted the debriefing at Corcoran State Prison.  Chief Deputy Warden Defendant Holland and Associate Warden Defendant Steadman of CCI were not involved with Hopkins' debriefing

---

[7]  As Defendants note, the Court has previously ruled that the use of the rosters in validating Plaintiff did not violate due process.  To the extent that Plaintiff attempts to argue that there was an alternative explanation for the information, his argument was addressed in the September 29, 2014, Findings and Recommendations, and the Court will not reopen the issue.  In addition to being addressed previously, the reliability of the roster is not relevant to the narrow issue now before the Court.  The same analysis applies to the issue of whether the address book was reliable.

interview or his May 25, 2010, Confidential Memo.  Hopkins Decl. ¶ 6.  Hopkins was not instructed by Defendants Holland or Steadman to investigate Plaintiff or prepare a Confidential Memo to support his NLR validation.  Hopkins Decl. ¶ 6; Holland Decl. ¶ 2; Steadman Decl. ¶ 2.

Because Hopkins' May 25, 2010, Confidential Memo referenced Plaintiff, a copy was placed in his Central File.  Hopkins Decl. ¶ 5.  The memo mentions over seventy inmates, many of whom were not housed at Corcoran, where the briefing took place.  It could therefore take as long as six months for the memo to be placed in an inmate's Confidential File.[8]  There is no way to know when the May 25, 2010, memo was placed in Plaintiff's file.[9]  Eubanks Decl. ¶ 17.

On July 1, 2010, the ICC informed IGI Lt. Defendant Noyce that Plaintiff was placed in Ag-Seg after he was caught checking the 128-G Chronos of other inmates.  The ICC asked Defendant Noyce if checking other inmates' 128-G Chronos indicated that Plaintiff was participating in gang-activity such that the safety and security of the institution required that he remain in Ad-Seg or be placed in the SHU.[10]  Noyce Decl. ¶¶ 2, 4, Ex. A.  Merely checking another inmate's 128-G Chrono is not necessarily an indication of gang activity, and would not be considered as evidence supporting validation.  Noyce Decl. ¶ 3.

In responding to the ICC, Defendant Noyce considered whether Plaintiff should be retained in Ad-Seg pending submission of a gang validation package at that time.  Therefore, Defendant Noyce reviewed Plaintiff's C-file to determine if there were enough source items to support gang validation.  Noyce Decl. ¶ 6.  Defendant Noyce's review on August 27, 2010, was not a gang

///

---

[8]  Plaintiff disputes this by arguing that Confidential Memos are emailed or faxed to other institutions, but he does not have personal knowledge of this and his contention is based only on speculation.

[9]  Plaintiff argues that there is no evidence to support finding that the May 25 Confidential Memo was *not* in his file on August 27, 2010, and it's more likely than not that it was in there.  He cites to a copy of the actual May 25 memo, but it does not give any indication as to when it was placed in his file.  ECF No. 123, at 126.  It is also *Plaintiff's* burden to come forward with evidence to support his claims, and he cannot fulfill this burden by pointing to an absence of evidence to support Defendants' claims.

[10]  Plaintiff contends that ICC told Defendant Noyce that he needed to complete the overall IGI investigation.  In support, he cites the initial review of his placement in Ad-Seg.  ECF No. 123, at 131.  The document indicates that Plaintiff was placed in Ad-Seg pending completion of an ongoing IGI into his participation in prison gang activities.  It does not, however, provide more specific information.  Plaintiff is correct that Defendant Noyce was directed to look into his potential gang activities, but Defendant Noyce's declaration and attached Exhibit A, the Ad-Seg Initial Placement Notice dated June 29, 2010, provide additional context.  The notice states that Plaintiff was caught requesting a 128-G Chrono from another inmate on June 27, 2010, and that his case was referred to IGI to determine if his actions constituted 'participation in criminal gang activity.'"  Noyce Decl. ¶ 4, Ex. A.  Plaintiff's evidence does not support his contention, especially in light of the evidence offered by Defendants.  These facts are therefore undisputed.

validation packet review.  No validation packet had been prepared.  Rather, he was simply

responding to the ICC's inquiry.[11]  Noyce Decl. ¶ 6.

Defendant Noyce does not recall which documents he reviewed before drafting the August

31, 2010, memo, nor can it be ascertained from the record which documents were in Plaintiff's file

when he conducted the review.[12]  Noyce Decl. ¶ 7.  The February 8, 2011, chrono authored by

Defendant Medrano could not have been in Plaintiff's file during Defendant Noyce's August 2010

review.  It is possible that the Confidential Memo/Debriefing Report dated May 25, 2010, was not in

Plaintiff's file on August 27, 2010.  Noyce Decl. ¶ 7.

Defendant Noyce concluded that there were not enough source items at the time he wrote his

memo.

Although Title 15 only requires three source items, it is Defendant Noyce's and Eubanks'

practice to obtain more than three to ensure that validation will be approved should one or more

items be rejected by the Office of Correctional Safety.[13]  Eubanks Decl. ¶ 29; Noyce Decl. ¶ 9.

Defendant Noyce did not conclude that Plaintiff's C-file contained unreliable evidence or

that the Confidential Memos were deficient in any way.[14]  Noyce Decl. ¶ 8.  Defendant Noyce's

August 2010 memo did not end the investigation.[15]  The memo stated, "Goolsby's activities and

[11]  For the reasons noted in footnote 10, above, Plaintiff's evidence does not dispute this fact.  Plaintiff also cites
Defendant Noyce's August 31, 2010, IGI review in arguing that Defendant Noyce was conducting an overall
investigation into Plaintiff's gang activity.  However, while Defendant Noyce's review states that an "extensive review"
of Plaintiff's central file was conducted to determine possible gang activities, Defendant Noyce specifically states that
Plaintiff was referred for gang review "due to being placed in Ad-Seg due to being observed checking 128-G chronos of
other inmates."  ECF NO. 123, at 133.  Defendant Noyce's review also addresses the practice of checking another
inmate's chrono.  There is no dispute that a gang validation packet was not pending.

[12]  Plaintiff disputes this by contending that Defendant Noyce's statement that he conducted an "extensive review" of his
C-file means that he reviewed all documents in his file.  That Noyce conducted an extensive review does not necessarily
mean that Defendant Noyce examined each and every document, nor does it dispute the fact that he cannot recall what
documents he examined.

[13]  Plaintiff attempts to dispute this by explaining that he has seen validation packages of other inmates where Noyce and
Eubanks had only three items before submitting a validation packet.  Admissibility issues aside, what Plaintiff may have
seen in other inmates' validation packets has no bearing on what their *general* practice is.

[14]  Plaintiff argues that Defendant Noyce found the Confidential Memos and address book to be insufficient evidence to
support a validation.  While this is correct, it does not mean that he found any one item to be unreliable or deficient.  It
simply means, as Defendant Noyce explains, that overall, he found insufficient evidence in Plaintiff's file at that time.

[15]  Plaintiff argues that Defendant Noyce's review ended the investigation into his gang activity.  He cites documents
indicating that the ICC and CSR ordered Noyce to complete the investigation, and Defendant Noyce stated himself that
"after completing this investigation. . ."  Plaintiff is correct that these documents reference completing an investigation,
but it is nonsensical to conclude that Noyce's investigation was a final, binding determination on Plaintiff's gang status
and somehow precluded further investigations.  Indeed, Defendant Noyce specifically stated that Plaintiff's activity and
behavior should be monitored for gang activity.  Plaintiff's own unsupported interpretation of the evidence is insufficient
to create a dispute of fact.  The Court will not repeat this analysis for each fact for which Plaintiff makes this argument.

behavior should be closely monitored and documented whenever gang activity and association is present." Eubanks Decl. ¶ 18.  Therefore, Defendant Eubanks continued to monitor and document Plaintiff's behavior and activities.  Eubanks Decl. ¶ 18.

Plaintiff was released from the IV-A SHU on September 10, 2010.  Eubanks Decl. ¶ 19.

On October 11, 2010, Defendant Eubanks conducted a debriefing of a validated gang member regarding his request for Sensitive Needs Yard placement.  The inmate stated that prior to Plaintiff's release from the IV-A SHU, Plaintiff was in control of 8 Building in IV-A SHU on behalf of a validated AB leader.[16]  Eubanks Decl. ¶ 19.  On October 28, 2010, Defendant Eubanks wrote a Confidential Memo to Defendant Gentry summarizing the October 11, 2010, debriefing.  Eubanks Decl. ¶ 20.  Because the memo referenced Plaintiff, a copy of the memo was placed in Plaintiff's confidential file.  Copies of debriefing memos were also placed in the confidential files of every inmate mentioned in the debriefing process as being connected to a gang in any way.  Eubanks Decl. ¶ 21.  Defendant Eubanks' October 28, 2010, Confidential Memo was not used to validate Plaintiff as an NLR associate.  However, the memo was further indication that Plaintiff was associating with White prison gangs and that the investigation should continue.[17]  Eubanks Decl. ¶ 21.

On October 14, 2010, an outgoing letter authored by Plaintiff was reviewed.  At the time, Plaintiff was housed in the general population.  Defendant Eubanks suspected that the letter was coded and sent it to the Cryptanalysis & Racketeering Records Unit of the FBI in Quantico, Virginia.  Plaintiff's letter was decoded by the FBI and contained business related to the AB.  Eubanks Decl. ¶ 22.

On November 28, 2010, Defendant Eubanks wrote a Confidential Memo to Defendant Noyce summarizing the information gained in decoding Plaintiff's October 14, 2010, letter.  Eubanks Decl. ¶ 23.  This memo was not used to validate Plaintiff as an NLR associate.  However, the letter was further indication that Plaintiff was associating with White prison gangs and that the investigation should continue.[18]  Eubanks Decl. ¶ 23.  It is not unusual for White gang members to be involved

---

[16] Plaintiff's relevancy objections to facts relating to the AB gang are overruled.

[17] Plaintiff attempts to dispute this fact because Defendant Eubanks mistakenly referred to the memo as a "roster" in his declaration.  This does not render the fact disputed.

[18] Plaintiff's opinion as to whether this letter warranted further investigation is not relevant and the fact is undisputed.

1    with several White-supremacist gangs.  The NLR, AB and Skinhead gangs share ideology, Nazi

2    symbols and often work in concert.[19]  Eubanks Decl. ¶ 24.

3          On January 13, 2011, Defendant Eubanks conducted an interview with Plaintiff regarding his

4    current gang status.  Plaintiff admitted to being a member of "The Chosen Folk" (TCF) Skinhead

5    disruptive group.  Plaintiff also stated that he has been a member of TCF for five years.  Pictures

6    were taken of Plaintiff's tattoos, which included a large swastika across his stomach, an Iron Cross

7    on his chest and a Celtic Cross on the back of his head with the letters "TCF."  Eubanks Decl. ¶ 24.

8          In January 2011, Assistant IGI Defendant Medrano analyzed Plaintiff's address book and

9    found that it contained the names of two validated members of the NLR prison gang- R. Pandolfi

10   and D. Baumgaertel.  Tyree Decl., Ex. A; Eubanks Decl. ¶ 27(e).  On February 8, 2011, Defendant

11   Medrano wrote a non-confidential CDCR 128-B Chrono memorializing his findings.  This was used

12   as evidence to validate Plaintiff.  Tyree Decl., Ex. A; Eubanks Decl. ¶ 27(e).

13         On February 11, 2011, Defendant Eubanks completed the investigation of Plaintiff's NLR

14   gang status and assembled a gang-validation packet to be sent to the Office of Correctional Safety.[20]

15   Eubanks Decl. ¶ 27.  Defendant Eubanks authored the gang-validation chrono on February 14, 2011.

16   Eubanks Decl. ¶ 27.

17         Investigations supporting gang validations may take years to complete.  In Plaintiff's case,

18   the investigation was ongoing since April 2009.  Validation was complex because he was associating

19   with members of the AB as well as the NLR, and some source items evidenced association with both

20   gangs.  Eubanks Decl. ¶ 28.

21         On February 14, 2011, Defendant Noyce approved Defendant Eubanks' chrono to validate

22   Plaintiff as an associate of the NLR prison gang.  Defendant Noyce independently reviewed the

23   evidence and confirmed that the source items used in the validation met the requirements of Title 15.

24   Noyce Decl. ¶ 10.  After Defendant Noyce's review, the validation package was sent to the Office of

25   Correctional Safety, where the evidence was again scrutinized and weighed.  Noyce Decl. ¶ 10;

26

27   [19]  Plaintiff argues that it "makes no sense" and is impossible for an inmate to be part of two gangs at the same time.  Defendant Eubanks stated that inmates can be *involved* with similar White-supremacist gangs.  In any event, Plaintiff's opinion, alone, does not create a disputed fact.

28   [20]  To the extent that Plaintiff argues that no new information arose after April 2009 to warrant further investigation, his opinion and interpretation of the evidence does not create a dispute of fact.

1   Eubanks Decl. ¶ 30.  The Office of Correctional Safety approved Plaintiff's validation as an

2   associate of the NLR on March 29, 2011.  Noyce Dec. ¶ 10.

3         Plaintiff was validated as an associate of the AB prison gang on May 5, 2011.  Noyce Decl. ¶

4   12.

5         B.      Allegations of Retaliation

6         Plaintiff alleges that Defendants retaliated against him because of Goolsby v. Carrasco, et al.,

7   1:09-cv-01650 JLT (PC).  Defendant Holland was screened out as a defendant in that action on

8   January 6, 2010.  Defs.' Req. Jud. Not., Ex. N.[21]  The parties did not settle Goolsby v. Carrasco until

9   November 3, 2011, eight months after Plaintiff was validated.  Defs.' Req. Jud. Not., Ex. N.

10         Plaintiff alleges that Defendant Holland retaliated against him because of Goolsby v. Cate,

11   Kern County Superior Court Case No. S-1500-cv-27006, filed on March 29, 2010.  Defendants

12   Holland and Steadman were not aware of Goolsby v. Cate until they were served in September or

13   October 2010.  Holland Decl. ¶ 3; Steadman Decl. ¶ 3.  The court sustained defendants' demurrer

14   without leave to amend on May 31, 2011, and found that the allegations in Plaintiff's complaint were

15   directly contradicted by his exhibits.  Defs.' Req. Jud. Not., Ex. A.

16         Plaintiff alleges that Defendant Holland retaliated against him because of Goolsby v. Scarlett,

17   et al., Kern County Superior Court Case No. S-1500-270540-LHB.  No Defendant in this case was a

18   defendant in Goolsby v. Scarlett, et al.  Defs.' Req. Jud. Not., Ex. G.

19         Plaintiff alleges that Defendant Holland retaliated against him because of Goolsby v. Tate, et

20   al., Kern County Superior Court Case No. S-1500-cv-270541, filed February 19, 2010.  No

21   Defendant in this action was a defendant in Goolsby v. Tate, et al.  Defs.' Req. Jud. Not., Ex. C

22         Defendant Holland chaired an ICC hearing on September 9, 2010.  ECF No. 123, at 261.

23   **IV.   DISCUSSION**

24         A.      Legal Standard

25         Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition

26   the government may support a section 1983 claim.  Silva v. Di Vittorio, 658 F.3d 1090, 1104 (9th

27   Cir. 2011); Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); see also Valandingham v.

28

---

[21]  Defendants' Request for Judicial Notice of Court documents (ECF No. 108) is GRANTED.  The Court may take judicial notice of court records in other cases.  United States v. Howard, 381 F.3d 873, 876 n.1 (9th Cir. 2004).

1   Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).

2   "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:

3   (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that

4   prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

5   Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

6   Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d

7   1108, 1114-15 (9th Cir. 2012); Silva, 658 at 1104; Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir.

8   2009).

9           B.      Analysis

10          There is no dispute that Plaintiff's lawsuits and appeals were protected conduct, that gang

11   validation is an adverse action, and that such action chilled Plaintiff's First Amendment rights.  The

12   parties therefore agree that this analysis focuses on the remaining two elements of Plaintiff's

13   retaliation claim: (1) whether the alleged actions were taken *because of* Plaintiff's appeals and

14   lawsuits; and (2) whether the action did not reasonably advance a legitimate correctional goal.

15   These issues will be examined in light of the question remaining in this action - whether there were

16   any additional documents, or some other explanation, to support the different results reached in the

17   reviews of August 2010 and February 2011.

18          Additionally, Plaintiff concedes that Defendant Gentry did not take any adverse action

19   against him and that summary judgment should be granted in his favor.  ECF No. 123, at 20.

20          1.      *Evidence of Retaliation*

21          To raise a triable issue as to motive, Plaintiff must offer evidence that Defendants knew

22   about the protected conduct.  Corales v. Bennett, 567 F.3d 554, 568 (9th Cir.2009).  In addition,

23   plaintiff must show "either direct evidence of retaliatory motive or at least one of three general types

24   of circumstantial evidence [of that motive]."  McCollum v. California Dept. of Corrections and

25   Rehabilitation, 647 F.3d 870, 882 (9th Cir.2011) (quoting Allen v. Iranon, 283 F.3d 1070, 1077 (9th

26   Cir.2002)).  To survive summary judgment without direct evidence, therefore, plaintiff must "present

27   circumstantial evidence of motive, which usually includes: (1) proximity in time between protected

28   speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or]

1  (3) other evidence that the reasons proffered by the [defendant] for the adverse ... action were false

2  and pretextual." McCollum, 647 F.3d at 882 (internal quotation marks and citation omitted).

3         Defendants argue that Plaintiff cannot show that Defendants Holland and Steadman, whom

4  he contends ordered the retaliatory validation, knew of his lawsuits and/or appeals.

5         The undisputed facts show that Plaintiff filed numerous appeals in 2009 and 2010, many of

6  which were answered by Defendants Holland and/or Steadman.  Plaintiff also filed the following

7  lawsuits: (1) Goolsby v. Carrasco, et al., filed against numerous officials, including Defendant

8  Holland, in September 2009; (2) Goolsby v. Scarlett, et al., filed against numerous officials, but not

9  against any Defendant in this action, in February 2010; (3) Goolsby v. Tate, et al., filed against

10  numerous officials, but not against any Defendant in this action in February 2010; and (4) Goolsby

11  v. Cate, et al., filed against numerous officials, including Defendants Holland and Steadman, in

12  March 2010.

13         The parties spend a great deal of time disputing whether Defendants Holland and Steadman

14  knew of these appeals and actions at any time prior to Plaintiff's February 2011 validation.

15  Defendants contend that they do not keep track of inmate appeals and were not aware of Plaintiff's

16  appeal history when he was validated.  Holland Decl. ¶ 4; Steadman Decl. ¶ 4.  They also contend

17  that they were not aware of Plaintiff's lawsuits at the time he was validated.  Hollman Decl. ¶ 3;

18  Steadman Decl. ¶ 3.

19         Plaintiff, on the other hand, contends that Defendant Holland demonstrated that she knew

20  about his appeals and lawsuits during the ICC meeting that she chaired on September 9, 2010.

21  Plaintiff alleges that during the hearing, Defendant Holland became upset and angry, and threatened

22  him.  She made comments such as, "Uhh.  I hate jailhouse lawyers.  When are you going to stop?

23  You're always complaining about everything- yard, medical.  Every week I have to answer one of

24  your appeals.  I am sick of it.  You need to knock this shit off or I am going to make you stop."  Pl.'s

25  Decl. ¶ 8 (ECF No. 123, at 84).[22]

26

27  [22]  Defendants characterize Plaintiff's declaration as self-serving and suggest that it should be discounted.  However, "declarations oftentimes will be self-serving-and properly so, because otherwise there would be no point in submitting them."  S.E.C. v. Phan, 500 F.3d 895, 909 (9th Cir.2007) (citing United States v. Shumway, 199 F.3d 1093, 1104 (9th

28  Cir.1999)) (internal quotation marks omitted).  Consequently, in most cases, the self-serving nature of the declaration "bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact."  Phan, 500 F.3d at 909 (citing Shumway, 199 F.3d at 1104) (internal quotation marks omitted).

Plaintiff also alleges that on December 1, 2010, his counselor, Defendant Holman, passed on a message from Defendant Holland threatening Plaintiff to drop his lawsuits or else he'd be validated.  Pl.'s Decl. ¶ 9 (ECF No. 123, at 84).  Also on December 1, 2010, Plaintiff states that he appeared at a hearing chaired by Captain Lundy.  According to Plaintiff, Captain Lundy also passed on Defendant Hollman's threat.  Pl.'s Decl. ¶ 10 (ECF No. 123, at 85).

Finally, Plaintiff contends that Defendant Eubanks, in January 2011, told Plaintiff that Defendant Hollman told him to validate Plaintiff as an NLR associate.  Pl.'s Decl. ¶ 11(ECF No. 123, at 85).  Plaintiff also alleges that Defendant Eubanks confirmed the retaliatory validation in April 2011, stating that Plaintiff "pissed all the AW's off with [his] 602s and lawsuits."  Pl.'s Decl. ¶ 12 (ECF No. 123, at 85-86).

Defendants dispute Plaintiff's accounts, contending that Defendant Holland did not take part in the investigations or validation, and did not direct anyone to validate him.  Holland Decl. ¶ 2.

Taking Plaintiff's evidence in the light most favorable to him, he has presented direct evidence that Defendant Holland knew of his lawsuits and appeals and threatened him with retaliation if he did not stop complaining.[23]

Defendants argue that the factual context makes Plaintiff's claims "implausible," and that in such circumstances, Plaintiff must present "more persuasive evidence than would otherwise be necessary in order to show that there is a genuine issue for trial."  Blue Ridge Ins. Co. v. Stanewich, 142 F.2d 1145, 1147 (9th Cir. 1998).  Specifically, Defendants contend that under the undisputed facts, no Defendant would act as Plaintiff has alleged.  For instance, it is implausible that they would fabricate an NLR validation when they had an actual AB validation, or could have placed him in the SHU for any number of reasons.  Defendants also believe that it is implausible that (1) Defendant Holland would openly and publicly threaten an inmate in front of other members of the ICC; and (2) Defendant Eubanks would make such a blatant admission in front of other inmates.  Defendants also find it suspect that Plaintiff recounts the threat from Defendant Hollman, and Defendant Eubanks'

///

---

[23] As Plaintiff has offered direct evidence of retaliation, the Court will not address issues related to circumstantial evidence of motive, such as timing.

1   warning, for the first time in his opposition.  The threats were not included in his complaint, the

2   rebuttal to his validation packet or in his appeal of his validation.

3        The Court recognizes that Plaintiff's only evidence of retaliation comes from his own

4   testimony.  However, given the deference that must be afforded to pro se litigants and the

5   requirement that the Court draw all justifiable inferences in Plaintiff's favor, the Court is hesitant to

6   impose additional burdens under a theory that his testimony is implausible.

7                    2.      *Legitimate Correctional Purpose*

8        The existence of the above disputed facts, however, does not end the inquiry.  Even

9   assuming, as the Court must, that Plaintiff's facts are true, Plaintiff bears the burden of pleading and

10   proving the absence of legitimate correctional goals for the conduct of which he complains.  Pratt v.

11   Rowland, 65 F.3d 802, 806 (9th Cir. 1995).  In other words, a retaliation claim fails if the adverse

12   action would have been taken anyway.  Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U.S.

13   274, 287 (1977).  When analyzing this issue, the Court must "afford appropriate deference and

14   flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for

15   conduct alleged to be retaliatory.  Pratt, 65 F.3d at 806 (citing Sandin v. Conner, 515 U.S. 472

16   (1995)).

17        There is no dispute that prisons have a legitimate interest in curtailing prison gang activity,

18   and in this regard, Defendants argue that "the evidence supported his validation to such a degree that

19   even if Defendants had a bad motive to validate Goolsby, he would have been validated anyway."

20   ECF No. 111-1, at 30.

21        Indeed, it is undisputed that the investigation into Plaintiff's NLR affiliation began in March

22   2009, during an investigation *unrelated* to Plaintiff.  Evidence gathered from March 2009 through

23   January 2011 tied Plaintiff to the NLR.  The Court need not list the evidence piece by piece because

24   Plaintiff admits that there were sufficient source items to validate him as an associate of the NLR.

25   ECF No. 123, at 28.

26        To avoid summary judgment, Plaintiff argues that his February 2011 validation was based on

27   the same documents that Defendant Noyce reviewed in August 2010, when he found insufficient

28   evidence to support a validation.  However, it is undisputed that Defendant Noyce does not recall

15

1    what documents he reviewed, and that it cannot be ascertained from the record which documents

2    were in his file at the time of the August 2010 review.

3            While the parties dispute what documents were in Plaintiff's file during Defendant Noyce's

4    review, there is at least one document that *could not* have been in the file at the time because it did

5    not exist as of August 2010.  Although Plaintiff's address book was originally confiscated in May

6    2009, it was not fully analyzed until January 2011 because it was a labor-intensive review that was

7    not undertaken until it became certain that there was other evidence to support a validation.  Plaintiff

8    disputes this, arguing that the address book was in his file at the time of the August 2010 review and

9    that the January 2011 analysis was performed to carry out the alleged retaliation.  Plaintiff's

10   argument, however, is simply speculation.

11           The speculative nature of Plaintiff's contention is apparent given the events after the

12   September 2010 hearing.  On October 11, 2010, Defendant Eubanks received information from

13   another inmate suggesting that Plaintiff was involved with the AB, another White-supremacist gang.

14   The information was not used to validate Plaintiff, but it did suggest that the investigation should

15   continue.  Similarly, in October 14, 2010, Defendant Eubanks sent a letter from Plaintiff to the FBI

16   for decoding.  The letter contained business related to the AB, and although it was not used to

17   validate Plaintiff, it suggested that the investigation should continue.  The NLR was originally

18   aligned with the AB, and it is common for White inmates to be involved with more than one White-

19   supremacist gang.

20           Plaintiff also argues that Defendant Noyce's August 2010 review completed any

21   investigation into his gang affiliation.  It is undisputed, however, that Defendant Noyce's review was

22   performed in the context of responding to the ICC's inquiry about inmates checking other inmate's

23   chronos, and the review did not end the inquiry.  As noted above, it is undisputed that further

24   information arose after September 2010, and Defendant Noyce's memo shows that he contemplated

25   such circumstances as warranting further investigation.

26           To the extent that Plaintiff argues that Defendant Noyce's August 2010 finding somehow

27   invalidated the February 2011 validation, he is incorrect.  The Court has previously determined that

28   Defendant Noyce's August 2010 conclusion did not invalidate the subsequent validation, or prove

1    that it was a "sham."  ECF No. 85, at 8.

2           Plaintiff also cites Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003), in arguing that "prison

3    officials may not defeat a retaliation claim on summary judgment by articulating a general

4    justification for a neutral process, when there is a genuine issue as to whether the action was taken in

5    retaliation for the exercise of a constitutional right."  The facts in Bruce, however, are

6    distinguishable.  There, the investigation into plaintiff's gang affiliation ended in 1995, and two

7    investigations (November 1995 and April 1996) concluded that there was insufficient evidence to

8    support validation.  Over two years later, plaintiff was placed in Ad-Seg and filed a series of appeals

9    related to prison conditions.  Within one month of filing his appeals, defendants told plaintiff that he

10   was being validated in retaliation for filing the appeals.  The evidence used was the same evidence

11   found to be insufficient on two prior occasions.

12          Unlike Bruce, this action involves a validation after an *ongoing* investigation revealed

13   additional evidence.  The validation was about six months after the insufficient evidence finding.

14   Although this action also involves validation after an inmate filed appeals, the facts do not support a

15   finding that the validation could only have been for retaliatory purposes.

16          Defendants are entitled to summary judgment on the retaliation claim.[24]

17   **V.      FINDINGS AND RECOMMENDATIONS**

18          The Court finds that Defendants' motion for summary judgment should be GRANTED.

19          These Findings and Recommendations will be submitted to the United States District Judge

20   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30)

21   days after being served with these Findings and Recommendations, the parties may file written

22   objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

23   Findings and Recommendations."  Replies may be filed within fourteen (14) days of service of

24   objections.  The parties are advised that failure to file objections within the specified time may result

25   in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 843 (9th Cir. 2014) (citing Baxter

26   v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

27   IT IS SO ORDERED.

28   [24] The Court will not address Defendants' qualified immunity argument in light of the recommendation that the motion be granted on the merits.

Dated:   __**January 13, 2016**__                    _____ /s/ *Dennis L. Beck*
UNITED STATES MAGISTRATE JUDGE